Guy MOLINARI, John McCain, Larry Rockefeller, The League of Women Voters of New York State, John Skabry, John Duffy, John C. Cochrane, Nick Teng, Stephen Miller, R. Frederick Linfesty, Tina Sheesley, Richard Stadin, Luis Ortega, Al Shapiro, Coleman Mishkoff, Angelo Marlinelli, Kathleen O'Neill, John D. Piro, Jr., George J. Schlink, Mark Quinn, Jennifer L. Kim, Eric W. Schreck, Lisa Anne Reilly, Jeremy B. Dibbell, Richard N. Canniff, Michael Paninski, Kevin McArdle, Robert Burns, John C. Mitchell, Gerald D. Ricci, Robert Lynch, Carl Heterbring, Kraig H. Kayser, Darren K. Eustance, James L. Dowsey III, Daniel S. Gottesman, Matthew Burin and Marcia E. Lynch, Plaintiffs,

Steve Forbes and Forbes 2000, Inc., Plaintiffs–Interveners,

Alan Keyes, Christopher T. Slattery, Eileen F. Slattery, Margot Damiano, Alan P. Mehldau, Audrey M. Negron, Edmund J. Keefe and Robert Hornak, Plaintiffs–Interveners,

v.

William POWERS, Chairman, New York Republican State Committee; New York Republican State Committee; New York State Board of Elections; Neil W. Kelleher, Carol Berman, Evelyn J. Aquila and Helena Moses Donohue, Commissioners, New York State Board of Elections; New York City Board of Elections; Douglas Kellner, Stephen H. Weiner, Michael H. Cilmi, Vincent J. Velella, Weyman A. Carey, Ronald J. D'Angelo, Terrence C. O'Connor, Crystal N. Paris, Gertrude Strohm and Frederic M. Umane, Commissioners, New York City Board of Elections; Erie County Board of Elections; Laurence Adamczyk and Ralph Mohr, Commissioners, Erie County Board of Elections, Nassau County Board of Elections; Barbara Patton and John Degrace, Commissioners, Nassau County Board of Elections; Suffolk County Board of Elections; Gerald Edelstein and Barbara P. Barci, Commissioners, Suffolk County Board of Elections; Monroe County Board of Elections; M. Betsey Relin and Peter M. Quinn, Commissioners, Monroe County Board of Elections, Defendants.

No. 99 Civ. 8447 (ERK) (ASC).

United States District Court, E.D. New York.

Feb. 4, 2000.

As Amended Feb. 10, 2000.

Burt Neuborne, Brennan Center for Justice at NYU School of Law, New York City (E. Joshua Rosenkranz, Nancy Northup, Glenn J. Moramarco, Nathaniel Persily, of counsel), Richard D. Emery, John R. Cuti, Emery Cuti Brinckerhoff & Abady PC, New York City (David H. Gans, of counsel), for plaintiffs Guy Molinari, et al.

Robert Allan Muir, Jr., Brooklyn, NY, Cleta Mitchell, Sullivan & Mitchell P.L.L.C., Washington, DC, for plaintiffs-interveners Steve Forbes, et ano.

James G. Rizzo, M. Miller Baker, Michael S. Nadel, Carr Goodson Warner, A Professional Corporation, Washington, DC (J. Michael Lehmann, of counsel), C. Michael Tarone, Washington, DC, for plaintiffs-interveners Alan Keyes, et al.

Lawrence A. Mandelker, Kantor, Davidoff, Wolfe, Mandelker & Kass, P.C., New York City, for defendants New York Republican State Committee and William D. Powers.

Todd D. Valentine, Special Counsel, New York State Board of Elections, Albany, NY, for defendant New York State Board of Elections.

### MEMORANDUM & ORDER

KORMAN, District Judge.

Plaintiffs bring this lawsuit challenging the constitutionality of the ballot access

rules for the primary (the "Primary") that will be held by the New York Republican State Committee (the "Republican State Committee") on March 7, 2000. The purpose of the Primary is to select the Republican State Committee's delegates to the 2000 Republican National Convention (the "Convention"), where, among other things, the Republican National Party (the "Republican Party" or the "Party") will select its nominee for the 2000 presidential election, the Party's national platform and the rules of internal Party governance, including rules governing the selection of delegates to the next convention. Davis Decl. ¶¶ 4, 6; Powers Aff. ¶ 8. Under the rules of the Republican Party, each state's local Party organization must select three delegates from each of its congressional districts to attend the Convention, and the majority of Convention delegates from each state must be selected by district, rather than on an "at-large" basis. Powers Aff. ¶ 9. As this national Party rule has been implemented in New York by the Republican State Committee, three Convention delegates (and three alternates) are to be elected in each of New York's 31 congressional districts during the Primary, and eight additional delegates will be chosen "at-large" by the Republican State Committee after the Primary. Molinari Decl.Ex. B at 1; Powers Aff. ¶ 10 & Ex. B.

On June 29, 1999, the Governor of New York signed into law 1999 Sess. Law News of N.Y. Ch. 137 (S. 5965–A) ("Chapter 137"), a statute providing two alternate schemes by which political parties in New York may hold their primaries. *See generally* Chapter 137. Parties must conduct their primaries under either §§ 2 and 2–a of the statute on the one hand, or § 3 on the other. *Id.* § 1. While Chapter 137 allows each political party to choose which option to adopt, it has been the practice in recent presidential election years, including this one, for the New York Legislature to pass an authorizing statute that merely codifies each party's preferred method of organizing its primary; thus, what appear to be the options from which the parties

may choose are in fact the choices they have already made. *See Rockefeller v. Powers,* 917 F.Supp. 155, 164 (E.D.N.Y. 1996), *aff'd,* 78 F.3d 44 (2d Cir.1996). The Republican State Committee selected §§ 2 and 2–a for the Primary. O'Brien Decl. Ex. A. The New York Democratic State Committee (the "Democratic State Committee") selected § 3 as the governing provision for its primary. *Id.* ¶ 5.

### The Republican and Democratic Options

Under §§ 2 and 2–a of Chapter 137, the scheme chosen by the Republicans, delegates are to be selected in direct elections conducted in each congressional district. Chapter 137 § 2[2][a]. When filing their candidacies, delegates must either declare themselves as aligned with a particular presidential candidate or declare themselves as "uncommitted." *Id.* § 2[3]–[4]. The name of the presidential candidate to whom each delegate candidate has declared allegiance (or the delegate candidate's "uncommitted" status, if applicable) is shown on the ballot next to or below the more prominent name of the delegate candidate. O'Brien Decl. ¶ 4. For a presidential candidate to "field" on the Primary ballot a delegate candidate or a slate of delegate candidates who are pledged to support him (and, conversely, for a delegate candidate to be permitted to pledge his or her support to a particular presidential candidate), (i) the presidential candidate must collect 5,000 signatures from registered Republican voters statewide, without regard to geographic distribution; and (ii) each delegate candidate pledged to support him must obtain signatures from the lesser of 1,000 or 0.5% of registered Republican voters in the district for which the delegate is a candidate. Chapter 137 § 2–a. Nevertheless, the 0.5% requirement is the operative requirement in every one of New York's congressional districts, because 0.5% of enrolled Republicans does not exceed 1,000 voters in any of the congressional districts. O'Brien Decl. ¶ 6; Buley Aff. ¶ 6. This adds up to approximately 15,500 signatures for delegate can-

didates in addition to the 5,000 that must be collected statewide for presidential candidates. By contrast, in order to qualify to run in the Republican primary for Governor of the State of New York, a gubernatorial candidate need only obtain 15,000 signatures. New York Election Law ("Election Law") § 6–136[1]. While some showing of support is required throughout the state, it suffices if the gubernatorial candidate obtains 100 signatures from each of only one-half of the congressional districts. *Id.*

The number of signatures required for a Republican presidential candidate to compete for delegates pledged to him also far exceeds the number required for a Democratic presidential candidate in New York. Under § 3 of Chapter 137, the scheme chosen by the Democratic State Committee, there is in fact an option for a statewide presidential primary, such that presidential candidates may obtain statewide Democratic primary ballot access solely by collecting 5,000 signatures from registered Democratic voters statewide, without regard to geographic distribution. Chapter 137 §§ 3[1], [3]. Under that option, if a Democratic presidential candidate also wishes to field delegate slates in each congressional district (which both Democratic front-runners opted to do this year, Berger Decl. ¶ 23), the delegate candidates in such slates, like those in Republican slates, also must obtain signatures from the lesser of 1,000 or 0.5% of registered Democrats in each congressional district. Chapter 137 § 3[6][c]. Unlike the option selected by the Republican State Committee, however, the number of delegates a Democratic candidate for President receives is not dependent upon the outcome of the delegate election, or even upon whether any delegate slates are on the ballot pledged to him. Instead, what determines whether a delegate from New York goes to the Democratic National Convention is solely the popular vote for the presidential candidates in the Democratic primary (and not the vote totals for the delegate candidates). Berger Decl. ¶ 23; Buley Aff. ¶ 11;

O'Brien Decl. Ex. B. Even if a Democratic presidential candidate has not qualified delegate candidates for the ballot in all or even any congressional districts, he still gets an allocation of delegates to the Democratic National Convention based on the popular vote. Buley Aff. ¶ 12. In such a circumstance, the Democratic State Committee names those delegates after the Primary. *Id.* In short, whether he fields a delegate slate or not, a Democratic presidential candidate may compete for delegates pledged to support him in each of New York's 31 congressional districts as long as he collects 5,000 signatures statewide (approximately 0.1% of the registered Democratic voters in the state).

Moreover, because it is essentially immaterial to Democratic presidential candidates whether delegates appear on the ballot in a particular congressional district, Berger Decl. ¶ 23, competing candidates seldom check, let alone challenge, whether petitions containing enough valid signatures have been filed to satisfy the 0.5% or 1,000 signature requirement or otherwise to comply with the substantive and technical rules that can lead to the invalidation of petitions. *Id.* By contrast, because a Republican presidential candidate can only obtain delegates pledged to him if they are elected in each congressional district, petition challenges are common. *See infra.* This, in turn, increases the total number of signatures that must be obtained by Republican candidates in each congressional district in order to ensure that their delegate slates are not thrown off the ballot. Thus, as defendant William Powers, who is the Chairman of the Republican State Committee, instructed in a memorandum to the petition drive coordinators for Texas Governor George W. Bush's campaign: "To ensure that ... delegates [pledged to support Governor Bush, the Republican State Committee's favored candidate this year,] get on the ballot in your congressional district, your goal is to collect *six times* the signatures required by the Election Law," which adds up to approximately

93,000 signatures. Molinari Decl. Ex. B at 4 (emphasis added).

Post-petition legal challenges are a standard part of the process of eliminating candidates who are not supported by the Republican State Committee. Richard H. Davis, who is Senator John McCain's national campaign manager, was the deputy campaign manager of Senator Robert Dole's campaign in 1996. Davis Decl. ¶¶ 1–2. Senator Dole was the Republican State Committee's favored candidate in 1996. Mr. Davis attests in his declaration that when he worked on the Dole campaign, campaign officials budgeted $700,-000 for the legal costs of challenging other candidates' petitions. *Id.* ¶ 37. Based upon his experience, Mr. Davis explains that the reason the Republican State Committee's favored candidate is willing to spend such a large sum on technical challenges is because that amount dwarfs the amount the campaign would have to spend competing in a contested Republican primary in New York's expensive media markets. *Id.* In other words, if successful, the Republican State Committee's favored candidate can spend $700,000 (the sum that the McCain campaign estimated it would have needed to spend this year simply to ensure statewide ballot access after post-petition challenges, *id.* ¶ 34) knocking other candidates off the ballot rather than the millions it would otherwise have to spend persuading voters at the Primary. *Id.* ¶ 37. The likelihood of such expensive challenges, of course, contributes to discouraging candidates from even attempting to obtain ballot access.

Legal challenges are not normally a concern of the candidate supported by the Republican State Committee, however, because the candidates who do not enjoy such support are too busy gathering signatures and defending post-petition challenges. They simply lack the resources to mount such challenges. The concern voiced this year by Chairman Powers reflected the Republican State Committee's fear that Steve Forbes — who, unlike Senator McCain and other publicly funded candidates, has unlimited resources and who was harassed four years ago by the challenge process — would mount his own post-petition challenge. *See* Molinari Decl. Ex. B at 3 (Chairman Powers noting, in his memorandum to Bush petition drive coordinators setting forth guidelines for the gathering of signatures, that "these guidelines have been established in order to avoid legal challenges. Any deviation from the guidelines could force the Bush campaign to expend time and money fighting legal challenges in court, when it should be campaigning for victory"). Indeed, the Forbes and Bush campaigns initially agreed not to challenge each other's petitions. This agreement was breached when delegate slates pledged to Mr. Forbes were knocked off the ballot in three congressional districts. The Forbes campaign retaliated with lawsuits that succeeded, at a cost of approximately $50,000, in knocking the Bush delegate slate off the ballot in another congressional district.

### The 1999–2000 Petitioning Period

Plaintiffs submit a great deal of evidence to illustrate the stark contrast between the collective burdens of the ballot access scheme as applied to candidates favored by the Republican State Committee, like Governor Bush, and as applied to those who are not favored, like Mr. Forbes (a plaintiff-intervener in this case), Alan Keyes (also a plaintiff-intervener) and plaintiff Senator McCain. An exposition of these differences in burdens as they actually played out in this year's petitioning process provides the background necessary to determine whether New York's legislative scheme unduly burdens ballot access.

#### A. *The Bush Campaign*

The record is undisputed that Governor Bush is the presidential candidate who enjoys the support of the Republican State Committee for the 2000 election. Powers Aff. ¶ 5. The Republican State Committee controls a massive apparatus of over 10,-000 Republican elected officials and work-

ers that are selected in each town, county and congressional district throughout New York. Molinari Decl. ¶¶ 7–9; O'Brien Decl. ¶ 15. Each county chairperson can easily mobilize the resources necessary to conduct a petition drive: recruiting potential delegate candidates, quickly obtaining up-to-date and usable walking lists of registered voters from the county boards of elections, supplying an army of dedicated Party workers who will gather signatures, making signers available at Party functions and providing persons who will review opposing petitions for technical defects. Molinari Decl. ¶ 11; O'Brien Decl. ¶ 15. The Republican State Committee delivered this apparatus to its favored candidate, Governor Bush, who then had the luxury of being able to obtain the necessary ballot access signatures relatively painlessly without having to devote scarce campaign resources better utilized on non-ballot-access-related campaign expenses in New York or in other states. Molinari Decl. ¶¶ 12, 14; O'Brien Decl. ¶¶ 15–17; Davis Decl. ¶ 36. Indeed, access to these resources enabled Governor Bush to collect over four times the total required number of signatures. Molinari Decl. 12, 14; O'Brien Decl. ¶¶ 15–17, 55.[1]

In an unusual twist (to which reference was made earlier), Governor Bush's delegate candidates were actually knocked off the ballot in one congressional district. Because of challenges that Bush supporters mounted against the Forbes petitions in three congressional districts, the Forbes campaign deemed the non-aggression pact between the two campaigns breached. *See* Clifford J. Levy, "Bush Kept Off Ballot in South Bronx After Party Admits Fraud," *N.Y. Times*, Feb. 3, 2000, at B6. Although the Forbes campaign had not filed objections to any other candidate's petitions with any of the boards of elections in the state prior to that breach, the Forbes cam-

paign responded to the challenges by bringing lawsuits seeking to have Bush delegate slates invalidated in six congressional districts. Berger Reply Decl. ¶ 24. The Republican State Committee admitted in the lawsuit challenging Bush petitions in the 16th Congressional District that Party workers had committed fraud by forging substantial numbers of signatures there. *See* Levy article, *supra*. Accordingly, Governor Bush's delegate candidates were knocked off the ballot in that district, and even he failed to field delegates in all 31 of New York's congressional districts.

### B. *The Forbes Campaign*

Mr. Forbes spent approximately $1 million in 1996 on petitioning gathering alone, and additional substantial sums litigating the post-petition technical challenges brought by supporters of the Republican State Committee's then-favored presidential candidate, Senator Dole. While initially satisfying the numerical signature requirements in every district, the Forbes delegates were knocked off in several due to those technical challenges. Forbes delegates ultimately appeared on the ballot in all 31 of New York's congressional districts only because of the injunction I issued in *Rockefeller v. Powers*, 917 F.Supp. 155 (E.D.N.Y.1996), *aff'd*, 78 F.3d 44 (2d Cir. 1996) (holding that the 1996 legislative scheme created an undue burden on ballot access).

This year, according to counsel at oral argument, the Forbes campaign spent approximately $650,000–675,000 on the petitioning phase alone (which does not count the cost of defending post-petition legal challenges to petitions, discussed below) and obtained approximately 45,000 signatures, thereby qualifying the Forbes delegate slates for access to the ballot in every district absent technical challenges. Muir Decl. ¶ 2. Tellingly, the Forbes campaign

---

1. By way of example, the Republican State Committee provided the Bush campaign with access to, and invited its members to petition at, "[p]ost-November election rallies and holi-day parties organized by the Town GOP committees," a source of "a great number of signatures." Molinari Decl. Ex. B at 3.

had to spend this amount despite the fact that the numerical signature requirements have been reduced since 1996, and despite the fact that he, unlike the other candidates not favored by the Republican State Committee, had already navigated the New York ballot access rules once, allowing him to create his own "far-flung" statewide apparatus more quickly. Davis Decl. ¶ 41. The Forbes petitions this year were challenged in the 2nd, 3rd and 4th Congressional Districts, and all were subsequently declared invalid by the respective county boards of elections, which had the result of knocking the Forbes delegate slates off the ballot in each of those districts. Muir Decl. ¶ 3.

In the 2nd Congressional District, several hundred signatures were declared invalid by the Suffolk County Board of Elections (which covers that district) under the town/city "trap." Muir Decl. ¶ 4. The town/city "trap" refers to the requirement under Election Law § 6–132 that both subscribing witnesses and signers must list their city or town of residence in addition to their residence address. Plaintiffs allege that this requirement becomes a trap because people often believe that the village they use as their mailing address is the "town" or "city" called for by the Election Law, when in fact the statute requires them to list the larger town/city unit within which their village of residence is located. Berger Decl. ¶¶ 5–7; cf. Matter of Zobel v. New York State Board of Elections, 254 A.D.2d 520, 678 N.Y.S.2d 794, 794–95 (3d Dep't 1998) (invalidating 6,435 signatures because the signer or subscribing witness designated the incorrect town or city on the petition).

In addition to the town/city invalidations, several hundred perfectly valid signatures witnessed by one particular witness were nonetheless invalidated in the 2nd Congressional District based on objections that included both the town/city problem and the fact that the witness, a registered Republican, had registered as a Democrat six years earlier. Muir Decl.

¶ 4. The witness had not voted in the six years in which he was a registered Democrat and, moreover, had been told by a commissioner of the Suffolk County Board of Elections that he was eligible to vote in the Primary by virtue of his more recent registration as a Republican. Id. The commissioner, who had herself been selected by the chairman of the Republican County Committee in Suffolk County, see Election Law § 3–504[2], apparently reversed her position as to the witness's eligibility and deemed the witness's new voter registration to be a "change of enrollment" that would not be effective until the next general election. Muir Decl. ¶ 4. This was all done without notice to the witness himself or to the Forbes campaign. Id. Even accepting the "change of enrollment" and other types of invalidations as proper, the Forbes petitions in the 2nd Congressional District still would have contained enough signatures to place his delegate slate on the ballot if not for the town/city invalidations due to technically incorrect witness addresses in that district.

In the 3rd and 4th Congressional Districts, general and specific objections to the Forbes petitions were filed without any notice to the Forbes campaign. Id. ¶ 5. The Nassau County Board of Elections (which covers those districts) invalidated the petitions on or about January 18, 2000 without making any minutes or other official record of the proceeding available to Mr. Forbes (despite the Forbes campaign's request). Id. ¶¶ 6, 10. While many of the signatures in these districts were invalidated because the signers were not registered voters or were not registered Republicans, nevertheless, more than 1,000 more were invalidated under the town/city "trap" because the witnesses had listed their village rather than their town or city. Id. ¶ 9. The Forbes campaign did not receive notice of these invalidations until January 21, 2000 — the date by which the campaign was required by law to file a proceeding challenging the invalidation of his petitions. Id. ¶¶ 7–8.

The difficulty of challenging the invalidations was compounded because the board of elections refused to disclose to the Forbes campaign the identity of the objectors and their addresses unless a personal appearance was made and a Freedom of Information request was filed seeking that information. *Id.* ¶ 11. Absent the town/city invalidations for the witnesses in these districts, the Forbes slates would have been on both ballots.

Thus, despite his campaign's huge expenditure of money on this year's petitioning process, laboring under requirements that have supposedly been relaxed since he first faced them in 1996, Mr. Forbes was forced to move to intervene in this lawsuit and to seek preliminary injunctive relief restoring his delegate slates to the ballot in the 2nd, 3rd and 4th Congressional Districts. At oral argument on February 1, 2000, a settlement was reached on the record between the Forbes campaign and defendants as to the specific relief the Forbes campaign was requesting in those congressional districts. Under the terms of the settlement, the objectors in each district (whom I permitted to intervene as party-defendants in this action for this purpose) agreed to withdraw their objections to the Forbes petitions *nunc pro tunc.* The Boards of Elections of Nassau and Suffolk Counties agreed to withdraw their rulings on the objections to the Forbes petitions. The end result is that Forbes slates will be restored to the Primary ballot in the 2nd, 3rd and 4th Congressional Districts.

## C. *The McCain Campaign*

Senator McCain is the only declared presidential candidate subject to federal matching fund spending requirements who has even attempted to gain statewide Republican ballot access in New York in 1996 or 2000. In early November 1999, days after the Republican State Committee selected §§ 2 and 2–a of Chapter 137 to govern ballot access for the Primary,[2] the McCain campaign made an initial critical decision in preparation for the New York ballot access petition drive. O'Brien Decl. ¶ 12. While experienced members of the campaign estimated, based on prior experience with gaining statewide ballot access in New York and on the current ballot access requirements, that it would cost at least $700,000 (and probably significantly more, following post-petition challenges) to successfully qualify delegates in every district, Davis Decl. ¶ 34, the campaign decided initially that it could only allocate $170,-000 to the overall Primary effort in New York, approximately 45% of which was to be devoted to petition-gathering alone. O'Brien Decl. ¶ 12; Davis Decl. ¶ 28.

Although the McCain campaign officials knew that $170,000 would be inadequate even to gain statewide ballot access in New York, let alone run an entire Primary campaign in New York, the sum far exceeded the amount it had allocated for ballot access in any other state. Davis Decl. ¶ 33.[3] Indeed, if the campaign had

**2.** The Republican State Committee, which was required to notify the New York State Board of Elections of its choice no later than November 1, 1999, selected §§ 2 and 2–a by letter dated October 27, 1999. O'Brien Decl. Ex. A.

**3.** Of the 43 United States jurisdictions that hold presidential primaries (42 states plus the District of Columbia), only 11 (including New York) require any signatures to be collected at all for ballot access. Winger Decl. ¶ 7; Keyes Pls.–Intervs.' Response to Feb. 1 Order, dated Feb. 2, 2000, at 2 & n.1. The majority of those jurisdictions that do not require any signatures permit a presidential candidate to get on the ballot either because he has received substantial media recognition as a serious candidate, because he has qualified for federal matching funds under the Presidential Election Campaign Fund Act, 26 U.S.C. §§ 9001 *et seq.*, because he has paid a modest filing fee, because he has made a request to be included on the ballot and/or by automatic inclusion. Winger Decl. ¶ 8. Of the 11 jurisdictions that do require signatures on some level, the Republican scheme in New York is by far the most burdensome, because of the combined effect of the total number of signatures required and the rules and practical considerations that apply to the petition-gathering process. *See id.* ¶ 10.

decided to allocate the $700,000–plus that it felt it needed to obtain statewide ballot access, that allocation would have constituted, at a minimum, slightly under half of the cash that Senator McCain had on hand at the time, all for the preliminary purpose of qualifying to compete statewide in New York. *Id.* ¶ 29. This would have diverted scarce financial resources from other vital needs of the nationwide campaign, including the need to devote substantial resources to its efforts to compete in the many primaries that precede New York's on March 7.[4]

With the limited (yet still substantial) resources it was able to devote to ballot access in New York, the McCain campaign put together a staff of 350 volunteers, with regional coordinators and coordinators in every congressional district devoted to recruiting delegate candidates, obtaining usable walking lists for petition circulators, gathering the signatures themselves and then preparing for and defending against technical challenges. O'Brien Decl. ¶ 14. The story of how each of these tasks was accomplished (or unable to be accomplished) demonstrates the burdens inherent in New York's ballot access scheme as applied to Republican presidential candidates who are not favored by the Republican State Committee and who do not have virtually unlimited financial resources.

### 1. Recruiting Delegate Candidates

The McCain campaign first needed to locate, interview and select 186 suitable Republicans — three as delegate candidates and three as alternates — in each of New York's 31 congressional districts. *Id.* ¶ 22. Plaintiffs submit evidence, however, that the Republican State Committee actively sought to discourage Party members from supporting Senator McCain or any presidential candidate other than the Republican State Committee's favored candidate, Governor Bush. Gottesman Decl. ¶¶ 9–10 (describing actions of the Erie County Republican Committee that made clear to delegate candidates that support for Senator McCain "would be viewed as a cardinal sin within the party — a sin that will potentially have negative political repercussions for [McCain supporters] for years to come"); Baker Decl. ¶¶ 3–7 (describing Republican State Committee discouragement of McCain supporters in Suffolk and Nassau Counties); Molinari Decl. ¶¶ 17–21 (describing same by Republican State Committee against McCain supporters). Indeed, some Party leaders told elected Republicans throughout the state who supported McCain that they should resign their official Party posts and that their political futures were in jeopardy. Gottesman Decl. ¶ 9; Baker Decl. ¶¶ 4–5; Molinari Decl. ¶¶ 19–21. Many McCain supporters within the Party declined to serve as delegate candidates as a result of such pressures. Baker Decl. ¶¶ 4–7; Molinari Decl. ¶¶ 17; O'Brien Decl. ¶ 23. Defendants deny that any of these incidents ever occurred, Powers/Republican State Committee Opp. Mem. at 31 n.3, and argue that, even if they had occurred, "[t]elling a member of the Executive Committee of the Erie County Republican County Committee that actively working against the delegate candidates supported by the Committee was inconsistent with serving in high office is not intimidation." Quinn Aff. ¶ 14.

Although the McCain campaign ultimately was able to locate a sufficient number of delegate candidates, it had to spend weeks locating, interviewing and selecting them (over 500 man-hours in all, extending well into the already brief 37–day petitioning period before the campaign had delegate candidates in all 31 congressional dis-

---

4. For example, the campaign needed to spend its money in New York and other states on activities such as producing and airing radio advertisements; establishing organizations in early primary states; press relations; travel; scheduling and advance work for appearances at debates, speeches and other public events (*e.g.,* 50 "town hall" meetings in January alone); issue development and speech writing; and fundraising through events, direct mail and telephone solicitations. *Id.* ¶ 30.

tricts) — a delay partly the result of the reluctance of many prospective delegate candidates to serve in light of Party discouragement. O'Brien Decl. ¶¶ 23–25; Molinari Decl. ¶¶ 16–17, 25.

### 2. *Obtaining Usable Walking Lists for Petition Circulators*

An accurate list of Republican voters is indispensable to a petition gathering operation. O'Brien Decl. ¶ 26. To be valuable to a circulator in the field, however, the list must be organized by congressional district (the relevant geographic unit for the Primary), and must include street addresses. *Id.* As discussed, the Republican State Committee delivered these critical walking lists to the Bush campaign. *Id.;* Gottesman Decl. ¶ 17.[5] By contrast, the McCain campaign had to overcome significant obstacles to obtain usable lists. O'Brien Decl. ¶¶ 26–37; Molinari Decl. ¶¶ 14–15.

Although commercial databases are available from which walking lists can be created, such lists are expensive (up to $45,000), and the McCain campaign initially determined that it could not justify allocating the kind of money necessary to acquire such a database. O'Brien Decl. ¶ 27. Accordingly, the campaign decided to try to obtain lists of Republican voters from the county boards of elections. This task, however, ultimately proved impracticable for the majority of congressional districts. *Id.* ¶¶ 27–28. Many boards of elections insisted upon a written request, and still refused to send the requested materials immediately upon receiving such a request; others required a certified check,

which caused a further delay; others refused to mail voter lists, claiming they were too voluminous; and still others told the campaign it would have to wait as many as eight to 10 days. *Id.* ¶ 28. The campaign estimated that purchasing all the voter lists from the county boards of elections would have cost approximately $7,000–$10,000. *Id.* ¶¶ 28–29.[6] In any event, a large portion of the lists that were available from the county boards of elections contained many formatting problems. For example, the lists were typically arranged by county, not by congressional district, and each database used different informational fields and file formats. *Id.* ¶¶ 29–31.

Just before Thanksgiving, the campaign determined that, even assuming the databases from the county boards of elections worked perfectly, it would lose a substantial portion of the already brief 37–day petitioning period just to create walking lists if it relied on the county boards. *Id.* ¶ 32. The campaign decided on December 5, 1999 to purchase a database costing $15,000, which it did not receive until December 8, 1999 — several days into the petitioning period. *Id.* ¶ 33. Unfortunately, that database turned out to be very difficult to use, and the campaign had to purchase new software from the same company to create the walking lists, which consumed an additional four days, thereby further compressing the time period it had for petitioning. *Id.* ¶¶ 34–36.

### 3. *Gathering Signatures*

Unable to hire enough petition circulators, the McCain campaign found ap-

---

5. Indeed, as plaintiff Guy Molinari states in his declaration, when he worked on Vice President George Bush's campaign in 1988, he was able "to walk into the Board of Elections for each county and receive up-to-date walking list [sic] in a manner of minutes." Molinari Decl. ¶ 15.

6. There were exceptions. In parts of Brooklyn and Staten Island, the McCain campaign was able to obtain walking lists quickly because members of the campaign had such lists in their possession from past petition

drives. *Id.* ¶ 37. In addition, defendants Laurence Adamczyk and Ralph M. Mohr, who are the commissioners of the Erie County Board of Elections, attest in a joint affidavit that after receiving a telephone request from the McCain campaign, on November 23, 1999, Mr. Mohr mailed, "without charge and on magnetic media," Erie County's "complete voter registration file," which included the name and address of each enrolled Republican voter in the 30th Congressional District. Adamczyk & Mohr Aff. ¶ 6.

proximately 350 volunteers to gather signatures. *Id.* ¶ 20.[7] However, with the exception of 15 notaries public and commissioners of deeds (who are the only people permitted under the Election Law to witness signatures outside their congressional districts of residence, Election Law § 6–132[2]), most of these volunteers could not be sent to areas of New York where they were most needed, such as rural upstate New York where it is more difficult to obtain signatures due to a widely dispersed population. O'Brien Decl. ¶¶ 42–43. And, the brevity of the petitioning period prevented ordinary volunteers from taking the examinations and applying to become notaries or commissioners of deeds, although many expressed an interest in doing so. *Id.* ¶ 44. Significantly, the McCain campaign official in charge of the petition drive attests in his declaration that, if the Election Law had permitted individuals who were not residents of signers' congressional districts to witness signatures, the campaign would have been able to send a sufficient number of volunteers to all areas of the state that would have enabled it to file valid petitions for delegate slates in every congressional district. *Id.* ¶ 63.

Having put together a volunteer staff of petition circulators — up to which point the campaign had already spent approximately six weeks, 1,500 man-hours and $75,000 on pre-petitioning tasks alone, *id.* ¶ 39 — further obstacles had to be overcome. The McCain campaign had approximately twenty days (some of which were holidays) remaining in which to gather the necessary signatures. *Id.* ¶ 50. The campaign gathered signatures almost exclusively by going door-to-door because this method resulted in signatures that were less susceptible to technical challenges. *Id.* ¶ 45. However, gathering signatures turned out to be extremely difficult.

First, Thanksgiving, Chanukah, Christmas, Kwanza and the New Year's holiday (this year the millennial celebration) all fell during the petitioning period. This is the most difficult period of the year to conduct a petition drive. *See* Molinari Decl. Ex. B at 3 (Chairman Powers instructing Bush petition drive coordinators, "[i]t is important to remember that the Presidential delegate petition process is more difficult than normal petition drives because it occurs during the winter, holiday period. Door-to-door signature gathering is, consequently, more difficult"). As a result, many registered voters were out of town or, even when they were home, were having family gatherings and did not wish to be disturbed. Moran Decl. ¶ 11; Bruno Decl. ¶ 11; O'Brien Decl. ¶ 49. Second, harsh weather conditions — including snow storms, during which white-out conditions made driving impossible, and weeks of bitterly cold and windy weather, with wind-chill temperatures below zero in some parts of the state — hindered the efforts of the volunteer circulators (some of whom had the flu) and sometimes kept them from working at all. Moran Decl. ¶ 12; Gottesman Decl. ¶ 19; Bruno Decl ¶ 12; O'Brien Decl. ¶ 51. Third, the walking lists the campaign had to use often were inaccurate, containing the names of persons who had died or moved, or who were not enrolled Republicans. Gottesman Decl. ¶ 20; Bruno Decl ¶ 10; O'Brien Decl. ¶ 54. Indeed, in some congressional districts, as many as 20% of the names on the lists were inaccurate. Gottesman Decl. ¶ 20; Bruno Decl ¶ 10. Fourth, the circulators were plagued by the problem of a "shrinking pool" of voters (caused by the New York statutory requirement that voters may sign only one candidate's petition for each delegate position), reaching many registered Republicans at home only to find that they had already signed petitions for other candidates. Moran Decl. ¶¶ 13–15; O'Brien Decl. ¶ 55. This was a partic-

---

**7.** The McCain campaign did receive calls from paid circulators who had been hired by the Forbes campaign at $12 per hour. *Id.*

¶ 42. They called to ask if the McCain campaign could pay a higher price. *Id.* It could not. *Id.*

ular burden in those congressional districts where only a tiny fraction of registered voters are Republicans.

In rural areas, where the populations are often widely dispersed, circulators often had to travel up to 30 miles simply to find enrolled Republicans to sign petitions. Moran Decl. ¶ 15. In these regions, the Bush campaign — using the Republican State Committee machine — had often obtained the signatures of registered Republicans in the bigger population centers, forcing the McCain campaign to go to very small towns, some of which had few enrolled Republicans, to gather signatures. *Id.* ¶¶ 14–15. In urban areas, many of which are overwhelmingly Democratic, different problems arose. There were often few if any Republican voters in a particular neighborhood or on a particular street, and the campaign often had to spend hours to get even a small number of signatures, asking for several signatures from persons on a particular block and then walking or driving several blocks to search out a few more. Bruno Decl. ¶ 7. It was frequently difficult for McCain circulators to obtain access to buildings in order to knock on individual apartment doors within those buildings because the front door of a particular building was often locked or guarded by a security guard or doorman. *Id.* ¶ 8. Moreover, during nighttime hours (the only available time that many circulators, who had daytime jobs, were able to volunteer), residents frequently refused to allow circulators into their house or building to ask them for signatures, and many refused even to answer the door, probably for fear that the circulator was a criminal. *Id.* ¶ 9.

#### 4. *Legal Challenges to the McCain Petitions*

With these substantial efforts, the McCain campaign managed to gather approximately 17,000 signatures for delegate candidates statewide (plus an additional 10,000 signatures in satisfaction of the statewide 5,000–signature requirement for Senator McCain himself), which, when geo-graphically distributed, were enough to field McCain delegate slates (before technical challenges) in only 25 of New York's 31 congressional districts (although the campaign filed petitions, even ones that were facially invalid because they contained an insufficient number of signatures, in 30 congressional districts). O'Brien Decl. ¶¶ 59–60.

Although the Bush campaign initially pledged not to file challenges, Molinari Decl. ¶ 23; Berger Decl. ¶ 19, the Republican State Committee and Bush supporters filed specific objections to petitions filed by the McCain campaign in 16 of New York's 31 congressional districts. Berger Decl. ¶ 19. The overall result of the challenges (many of which were similar to the challenges to the Forbes petitions described earlier) was that McCain delegate slates, who filed facially valid petitions in 25 congressional districts, would only have appeared on the ballot in 19 congressional districts without relief in this proceeding. Bush delegate slates would have appeared on the ballot in 30 districts, and only the Forbes delegate slates — by virtue of the settlement entered into during the course of this lawsuit on February 1, 2000 — would have appeared on the ballot statewide.

#### The February 4, 2000 Stipulation and Order

The McCain plaintiffs moved for a preliminary injunction to, *inter alia,* declare the entire Republican-selected ballot access scheme unconstitutional as applied and direct defendants to place delegate candidates pledged to support Senator McCain on the ballot in each of New York's 31 congressional districts. The settlement resulting from the Forbes plaintiffs-interveners' motion for a preliminary injunction in this lawsuit has already been discussed. Joining the McCain plaintiffs' motion for a preliminary injunction (also by motion to intervene) were declared Republican presidential candidate Alan Keyes and certain of his supporters, who further sought, *inter alia,* to have Keyes delegate

slates placed on the Primary ballot in every district. I heard oral argument on the preliminary injunction motions on January 28, 2000, and again on February 1, 2000. On February 4, 2000, the parties entered a stipulation that provided the predicate for injunctive relief. I accepted that stipulation. Because this is a matter that goes beyond the interests of the parties to the litigation and involves the invalidation of a legislative scheme, I accepted the stipulation only after independently concluding that the scheme, both in its totality and by virtue of two of its individual but related elements, places an undue burden on the right to vote under the First Amendment. I did so in a written memorandum and order that was prepared under the pressure of time. The principal purpose of this amended memorandum and order is to provide the factual context for that conclusion.

### Discussion

This is not the first case to appear before me raising First and Fourteenth Amendment challenges to the ballot access rules for the Republican State Committee's presidential primaries in New York. *See generally Rockefeller v. Powers*, 909 F.Supp. 863 (E.D.N.Y.1995), *rev'd*, 74 F.3d 1367 (2d Cir.1995) (*"Rockefeller I"*) and *Rockefeller v. Powers*, 917 F.Supp. 155, 164 (E.D.N.Y.1996), *aff'd*, 78 F.3d 44 (2d Cir. 1996) (*"Rockefeller II"*). The lawsuit underlying *Rockefeller I* and *Rockefeller II* was filed in advance of the Republican State Committee's 1996 primary in New York. The plaintiffs in that case were registered Republican voters from a number of New York's congressional districts who wished to be able to vote in that year's primary for delegate candidates pledged to support a range of Republican presidential candidates (including, by motion to intervene, registered Republican voters who wished specifically to be able to vote for delegate candidates pledged to support Mr. Forbes). The defendants were substantially the same defendants as are being sued in this case. The decisions in

*Rockefeller I* and *Rockefeller II* were engendered by the plaintiffs' motion for a preliminary injunction seeking, *inter alia*, to invalidate the Republican signature ballot access requirements for delegate candidates.

Under 1995 N.Y.Laws Ch. 586 ("Chapter 586"), the 1996 New York primaries' statutory analogue to this year's Chapter 137, the Legislature offered two alternative ballot access schemes to the Republican and Democratic State Committees. The alternative that had been submitted to the Legislature by the Democrats was exactly the same as the alternative the Democrats selected this year — *i.e.*, a statewide 5,000–signature requirement that provided statewide ballot access in the presidential primary, and a 0.5% or 1,000 per-district signature requirement for presidential candidates who opted to run delegate slates. The other alternative under Chapter 586 — the one submitted by the Republicans — was different from the one selected by the Republicans this year. Under that alternative, delegate candidates were required to obtain signatures from the lesser of 1,250 or 5% of enrolled Republican voters in their congressional districts. As with this year's Republican choice, there was no "presidential" primary in 1996. I decided *Rockefeller I* on equal protection grounds, holding that the 1,250 or 5% rule, as applied, violated the equal protection clause because the burdens on ballot access it placed on delegate candidates in congressional districts with relatively few Republicans were substantially higher than the burdens it placed on delegate candidates in congressional districts with many Republicans. I pass over the proceedings on appeal other than to note that the Court of Appeals reversed my ruling and that the current legislative scheme has cured the defect that my initial equal protection ruling found offensive.

When the case returned to me on remand, I considered only plaintiffs' claim that the statutory ballot access scheme unduly burdened the right to vote under

the First Amendment. I found that it did. Specifically, I found that the evidence demonstrated that candidates without the support of the Republican State Committee were substantially burdened by the *combination* of (i) the numerical 5% or 1,250 signature requirement (now 0.5% or 1,000), which required a minimum total number of signatures necessary to put a candidate's name on the ballot in all 31 districts of approximately 37,000 (now approximately 15,500), and which required "presidential candidates who do not enjoy the support of the existing Party apparatus [to] create far-flung organizations that reach to every corner of New York State"; (ii) the requirement (still in effect this year) that the collection of signatures must occur in a period of 37 days from December through early January, during which there are several important holidays, inclement weather, school and family vacations, and short periods of daylight; (iii) the rule (still in effect this year) limiting a voter from signing petitions for more than one candidate, thus resulting in a "shrinking pool" of signers available to those collecting signatures; (iv) a host of rules (the most burdensome of which are still in effect this year, despite marginal post-*Rockefeller II* amendments) defining what constituted a valid signature, including rules as to the qualification of witnesses to signatures (each had to be a registered Republican voter residing in the same district as the signer, a notary public or a commissioner of deeds) and the town/city requirement; and (v) other highly technical requirements (a number of which are still in effect this year) concerning the presentation of petitions containing the signatures to election officials. *See generally Rockefeller II.*

The combination of these rules not only made it difficult to get on the ballot, but also encouraged burdensome and expensive post-petition challenges for presidential candidates (other than the one supported by the Republican State Committee). *Id.* The non-favored candidates had to allot tens of thousands, if not hundreds of thousands, of dollars to such challenges. Indeed, the campaign of Senator Dole, who was the candidate favored by the Republican State Committee in 1996, budgeted $700,000 for postpetition challenges, because it was cheaper to avoid a primary contest than to compete in it. Davis Decl. ¶ 37. Such a result, of course, can be achieved by knocking a challenger off the ballot in a sufficient number of districts to reduce the challenger's incentive to compete in the state at all (given the cost of a media campaign in New York). The history of the New York Republican primaries demonstrated that, as a consequence, viable candidates for the Republican presidential nomination had not attempted to compete for delegates at all, and that those who had so attempted failed to qualify in a significant number of districts. *See Rockefeller II*, 917 F.Supp. at 157–59. Indeed, in 1996, Mr. Forbes was knocked off the ballot in four congressional districts on technicalities that had nothing to do with the number of valid signatures he had collected. *See id.* at 161 n. 6–8, 162–63 & n. 9.

The legislative scheme, combined with empirical evidence as to its effects, led me to conclude that the scheme in its totality severely burdened ballot access. I quote here from the ultimate paragraph in my discussion of this issue:

> In sum, the New York scheme fails to pass the simple, sensible test the Supreme Court offered in *Storer v. Brown* as a guide to district court judges who must address "the inevitable question for judgment," *Storer v. Brown*, 415 U.S. 724, 742, 94 S.Ct. 1274, 1285, 39 L.Ed.2d 714 ... (1974), in an area that "provides no litmus-paper test," *id.* at 730, 94 S.Ct. at 1279:
>
>> [C]ould a reasonably diligent independent candidate be expected to satisfy the signature requirements, or will it be only rarely that the unaffiliated

candidate will succeed in getting on the ballot?

*Id.* at 742, 94 S.Ct. at 1285. The answer is that, in some districts, in some years, a candidate other than the favored candidate could. Indeed there will always be a candidate, almost always an atypical one, who, because of fame and fortune or a political base within New York, will prevent the Republican State Committee from holding a primary without any contests in all thirty-one districts. Nevertheless, there will always be a significant number of districts without any contest, where the "fundamental right to vote is infringed," [*Rockefeller v. Powers*, 74 F.3d at 1379], and an even greater number of districts with a very limited choice, where the right to vote is "heavily burdened," *Lubin v. Panish*, 415 U.S. at 709, 716, 94 S.Ct. 1315, 1320, 39 L.Ed.2d 702 (1974). Such a scheme, not justified by any sufficiently compelling state interest, is unconstitutional.

*Id.* at 165.

■ This year, defendants have stipulated that "the provisions of the New York State Election Law at issue herein impose an undue burden on access to ballot in connection with the 2000 New York State Republican Presidential Primary." Stipulation, dated Feb. 4, 2000, at 2. I accept the stipulation of the parties and issue injunctive relief directing that full delegate slates, and alternate delegate slates, pledged to Senator John McCain, Steve Forbes, Alan Keyes and Governor George W. Bush be placed on the Republican primary ballot in each congressional district located in the State of New York, subject to certain conditions unimportant to this discussion. I do so because I find (i) that the New York ballot access scheme as applied to the Primary poses an undue burden in its totality on the right to vote under the First Amendment, *see generally Rockefeller II,* and (ii) that two individual but related elements of that scheme are themselves unconstitutional.

■ The conclusion that the New York ballot access scheme poses an undue burden in its totality invokes the application of the principle "that a number of facially valid provisions of election laws may operate in tandem to produce impermissible barriers to constitutional rights." *Storer v. Brown,* 415 U.S. 724, 737, 94 S.Ct. 1274, 1282, 39 L.Ed.2d 714 (1974). The underlying factual predicate for my agreement with the stipulation of the parties that the overall ballot access scheme poses an undue burden is set forth in the preceding discussion. I discuss here the reasons for concluding that at least two elements of that scheme are unconstitutional. Specifically, I am referring to the related requirements under Election Law § 6–132 ("§ 6–132") that (i) each witness to a designating petition must either be a registered Republican voter residing in the congressional district of the delegate candidate for whom he or she is witnessing signatures, or, in the alternative, must be a notary public or commissioner of deeds, § 6–132[2]–[3]; and (ii) the town/city "trap" to which I have alluded. § 6–132[1]–[2].

Plaintiffs offer an example illustrating the nature of the "trap." In one of Long Island's congressional districts, the large Town of East Hampton includes several discrete villages including East Hampton and Montauk. Berger Decl. ¶ 6. One who lives in Montauk usually views that as his or her "town," and will so state on a petition. *Id.* This would invalidate the signature under New York law, because Montauk is not the town in which the signer resides; the town is East Hampton, though it is 20 miles down the highway and has a very different culture and character. *Id.* This is what has prompted plaintiffs to characterize the requirement as a "trap for the unwary," *id.* ¶ 5, and the requirement has served as the basis for the invalidation of thousands of otherwise perfectly valid signatures both in 1996 and in this year's petitioning process. Signatures of witnesses (and signers) are invalidated under this "trap" even where their

residence addresses are listed in a manner that would enable letters addressed to them to be delivered by the post office.

The requirement that a witness list separately on the petition the town or city in which he or she resides is related to the requirement that a witness (other than a notary public or commissioner of deeds) reside in the "political subdivision in which the office or position is to be voted for," § 6–132[2], and that he or she must be a registered member of the same political party as the voters qualified to sign the petition. The listing of the town, instead of the village, in which the witness resides, at one time made it easier to determine whether the witness was a registered member of the same political party as the voters qualified to sign the petition, and to determine that the witness resided in the relevant political subdivision. This explains why a notary public or commissioner of deeds, who also may witness a petition signature, but who is not subject to the residence requirement, need not separately list the town in which he or she resides in addition to his or her residence address.

Section 6–132 is invalid as applied here for two reasons. The first relates to the reason for the requirement that a witness or signer separately list the town or city in which he or she resides in addition to his or her residence address. The provision was adopted before the lists of registered voters in New York were computerized. The boards of elections in New York State now keep track of voters on computerized lists, so it is easy to determine the witness's or signer's congressional district. Berger Decl. ¶ 7. Indeed, it can be done with greater ease than in the pre-computer days, when the name of the witness or signer had to be manually checked against the list for the town or city. Moreover, these computerized lists are compiled by counties, not by the towns. *Id.* Accordingly, there is no conceivable reason to require a witness or signer to list his or her town to verify that he or she is registered in the congressional district.

In *Schulz v. Williams,* 44 F.3d 48, 59 (2d Cir.1994), the Second Circuit upheld the now repealed requirement that signers of petitions for independent candidates list their election district ("ED"), assembly district ("AD") and ward ("W"). Nevertheless, it suggested clearly that, if the State of New York had "a statewide computer system that was capable of checking the registration status of nine million voters," *id.,* the invalidation of petitions for a failure to list ED, AD and W could not be sustained. This was true even under the rational basis test by which the requirement was judged.[8] The fact that registration lists in New York State are now computerized "changes the calculus" by which the asserted interest in the town/city listing requirement must now be judged. *Id.*

Moreover, where the name of the village has been filled in, rather than the town or city, and where it has been done correctly, anyone with familiarity with a particular county can readily determine the town or city in which the village is located. For example, in one of the congressional districts in which Forbes delegate candidate petitions were invalidated, a witness listed the Village of Wantagh (instead of the Town of Hempstead), yet it is not disputed that anyone likely to challenge a signature in Nassau County would know that Wantagh is in the Town of Hempstead. The disqualification in this instance is akin to disqualifying a petition in New York City because the witness listed Brooklyn instead of New York City as the city of his or her residence. Since everyone knows that Brooklyn is in New York City, it would be absurd to invalidate a petition containing the signatures of otherwise

---

8. This deferential standard was applied because there was no proof that the ED, AD and W requirement was part of a deliberate design by the principal parties to prevent ballot access, and because "23 of the last 24 petitions resulted in independent bodies gaining access to the ballot." *Id.* at 58.

qualified voters because of an asserted impediment to checking the residence and party registration of the witness. Such a result deprives the voter who signed the petition of the right to participate in the primary process by placing on the ballot candidates whom he or she supports. It also deprives the delegate candidates of a place on the ballot and, here, it deprives a candidate for President of the United States of the opportunity to have an elected delegate pledged to support him at the Convention. Moreover, it does this for no rational, much less compelling, reason.

█ This is not the only reason why part of § 6–132 is unconstitutional as applied here. The need for the separate listing of the town or city (in addition to the residence address), as previously indicated, was to facilitate confirmation of compliance with the requirement that a witness reside in the same political subdivision as the political candidates for whom he or she is circulating petitions. The residence requirement, however, is itself invalid. The usual justification for a residence requirement is that a witness be answerable to a subpoena or other process. *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, ——, 119 S.Ct. 636, 644, 142 L.Ed.2d 599 (1999). This concern is satisfied, however, if the witness resides anywhere within the State of New York and provides an affidavit listing his or her residence address. *Id.*

Moreover, while the witness plays some role in insuring the integrity of the petition signing process, there is absent any connection between the residence of a witness in a congressional district and the reliability of the petition gathering process. The reality is that all witnesses are partisan petition circulators whose goal is to convince voters to sign the petitions. Beyond an oral inquiry, they are not legally required to confirm the identities of voters who sign the petitions. Rather, witnesses subject to the residence requirement merely confirm that the person whose signature appears on the petition "subscribed the same in my presence on the dates above indicated and identified himself to be the individual who signed this sheet," § 6–132[2], and notary witnesses merely confirm that the person "signed same in my presence and . . ., being by me duly sworn, each for himself, said that the foregoing statement made and subscribed by him, was true." § 6–132[3].[9]

Residence provides no assurance that the witness is any less likely to accept false signatures. Indeed, because the witnesses are partisans of the candidates on whose behalf they are circulating petitions, they are "motivated entirely by an interest" in having their candidates get on the ballot. *Meyer v. Grant*, 486 U.S. 414, 426, 108 S.Ct. 1886, 1894, 100 L.Ed.2d 425 (1988). Thus, residents and non-residents both appear to lack any special qualifications that insure the integrity of the process. Only the fact that they can both be subject to prosecution if they file false certifications contributes to the integrity of the process. *Id.*, 486 U.S. at 426–427, 108 S.Ct. at 1894.

The New York State Board of Elections asserts that the residence requirement is based on a "presumption" that a witness who is a resident of a district "will have some familiarity with persons who sign petitions." Letter of T. Valentine, dated Feb. 2, 2000. This argument is simply wrong. Election Law § 135, the predecessor of § 6–132, required that the witness include a statement under oath that the witness "know[s] each of the voters whose names are subscribed to the above sheet of the foregoing petition." *Application of Kaplan*, 269 A.D. 561, 562, 56 N.Y.S.2d 499, 500 (1st Dep't 1945), *aff'd sub nom. Kaplan v. Greenman*, 294 N.Y. 584, 63

---

**9.** The only differences between the two are that (i) the notary witness swears the petition signer, while the non-notary witness does not; and (ii) the non-notary witness acknowledges that his own statements are made under the penalties of perjury, while the notary makes no such acknowledgment.

N.E.2d 337 (1945). The requirement does not appear in § 6–132, which only requires that the witness attest to the fact that the signer "identified himself to be the person who signed the petition." Indeed, even former § 135 was satisfied by a simple inquiry to a total stranger asking if he was a resident of the area and a duly qualified voter. *Schaller v. McNab,* 16 N.Y.2d 976, 977, 265 N.Y.S.2d 290, 212 N.E.2d 776 (1965); *Faerber v. LeFever,* 51 A.D.2d 1051, 1052, 381 N.Y.S.2d 523, 523 (2d Dep't 1976), *aff'd,* 38 N.Y.2d 1019, 384 N.Y.S.2d 448, 348 N.E.2d 924 (1976). Since the Legislature has eliminated the personal knowledge requirement, which was never literally construed, it is inconceivable that it retained the witness residence requirement because of a presumption that a witness — who resides in a congressional district with hundreds of thousands of voters — "will have some familiarity with those persons who sign the petitions." Letter of T. Valentine, dated Feb. 2, 2000.

The Republican State Committee argues that "New York also has an interest in not permitting someone who does not reside in the district to impose the cost of a primary on the district." Letter of L. Mandelker, dated Jan. 31, 2000, at 2. This argument is based on an erroneous factual premise. It is not the witness who imposes the cost of a primary on the district, it is only registered Republicans who reside in the district and who sign the petition that impose the cost of a primary (assuming more than one slate of candidates obtains the requisite number). Moreover, the asserted "interest in not permitting someone who does not reside in the district to impose the cost of a primary on the district" cannot be reconciled with the fact that notaries can circulate and witness petitions in any district regardless of residence or party registration. Indeed, in an effort to avoid the

witness residence requirement in the 1996 presidential primary, Mr. Forbes hired commissioners of deeds, the New York City equivalent of a notary public, at $20 per hour. *Rockefeller II,* 917 F.Supp. at 161.[10] If the asserted interest was to limit petition circulators to residents of the congressional district, the notary exception cannot be explained.

More significantly, unlike an election for a purely local office, New York recognizes that all affiliated members of the Republican Party who reside in New York have an interest in the delegate selection process in each congressional district. This is reflected by the requirement that a declared candidate for the Republican presidential nomination must obtain the signatures of 5,000 Republicans from anywhere in New York before a delegate candidate in a particular congressional district can declare himself or herself as pledged to support that presidential candidate. Chapter 137 § 2–a. Indeed, the General Counsel to the Republican State Committee, at whose request the statewide 5,000–signature requirement was added, Buley Aff. ¶ 18, tells us that "[t]he purpose of a presidential candidate's 5,000 signature statewide petition is to demonstrate a sufficient modicum of support in the State for the presidential candidate to allow delegate candidates to be identified on the ballot as committed to him." *Id.* ¶ 9. Thus, under the present scheme, a registered Republican can both sign and witness a petition that will qualify delegates in all of New York's congressional districts to run as pledged to support a presidential candidate at the Convention, but that same registered Republican cannot *witness* a petition to place a delegate candidate on the ballot pledged to that presidential candidate in any congressional district other than the witness's district of residence.

10. Nevertheless, the Republican State Committee managed to thwart him in at least one congressional district. There, a newly recruited commissioner of deeds filed his commission a few days after he had collected and witnessed petition signatures. *Id.* at 161 n.6.

The petitions were invalidated even though "[t]he witness had taken and passed the required test, paid the required filing fee, and been approved by the New York City Council for the office of Commissioner of Deeds." *Id.*

The proffered reasons for the residence requirement simply cannot. justify the burden the residence requirement places on the petition gathering process. In essence, the residence requirement reduces by approximately 2.9 to 3 million voters the pool of Republicans available to volunteer to petition for signatures in any particular district. By limiting petition witnesses/circulators to registered Republicans who reside in the particular congressional district, the statute burdens the effort of a presidential candidate to recruit enough registered Republicans who reside in New York to assist in gathering petitions; it also burdens the effort of delegate candidates who seek to run as pledged to him to get a place on the ballot. The problem is particularly acute in at least a third of the congressional districts in which Republicans· constitute only a small fraction of the number of registered voters.

Nor is the facially low percentage of signatures required in each congressional district (0.5%) a mitigating factor. This is so because the burdens New York places on the petitioning process make it far more difficult to obtain the requisite signatures. Indeed, Chairman Powers concedes that a campaign should attempt to collect at least six times that percentage (or approximately 93,000 signatures) to ensure survival against post-petition challenges resulting from the technical rules of the kind at issue here that can result in the invalidation of petitions signed by otherwise qualified Republican voters. *See* Molinari Decl. Ex. B at 4. Moreover, because this percentage must be collected in each of the 31 congressional districts in New York, it is far more difficult a task than collecting a comparable number of signatures statewide where the petitions can be circulated by any registered Republican who resides in the state.

While the effect of the residence requirement on a presidential candidate like Mr. Forbes or Senator McCain is significant, *see* O'Brien Decl. ¶ 63 (political director of McCain campaign attesting that, had registered Republican voters from *any* of New York's congressional districts been permitted to witness signatures, "we would have · been able to obtain the necessary signatures in all thirty-one [congressional districts]"); the requirement poses no burden for the candidate supported by the Republican Party or the Republican State Committee. This candidate has available the Party activists in each congressional district to circulate petitions on his behalf. Molinari Decl. ¶¶ 11–12, 14; O'Brien Decl. ¶ 15. There is no need to look for help from outside the district. Only candidates who do not enjoy the support of the Party organization need such help. Indeed, it is this fact that provides the only comprehensible reason for the residence requirement, which, like the entire primary ballot access scheme, is enacted by the Legislature at the behest of the Republican State Committee.

*Buckley v. American Constitutional Law Foundation, Inc.,* 525 U.S. 182, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999) eliminates any doubt on this issue of the validity of the witness residence requirement. There, the Supreme Court held invalid the Colorado statutory requirement that initiative-petition circulators be registered voters. The requirement reduced the pool of petition circulators from 2.3 million to 1.9 million. Noting that "[p]etition circulation is core political speech because it involves interactive communication concerning political change," *id.,* 525 U.S. 182, 119 S.Ct. at 639 (internal quotation marks omitted), the Court found that the registration requirement "drastically reduces the number of persons, both volunteer and paid, available to circulate petitions." *Id.* 525 U.S. 182, 119 S.Ct. at 643. Specifically, the Supreme Court held that, like the restriction on payments to petition circulators, which it had previously struck down, *Meyer,* 486 U.S. 414, 108 S.Ct. at 1895, 100 L.Ed.2d 425, the ineligibility of unregistered voters implicated the First Amendment because it limited the number of

voices who could convey the message of the initiative's proponents, and because it also reduced the chance that the initiative proponents would gather signatures sufficient in number to qualify for the ballot, and thus limited the proponents' " 'ability to make the matter the focus of statewide discussion.' " *Buckley*, 525 U.S. 182, 119 S.Ct. at 644 (quoting *Meyer*, 486 U.S. at 423, 108 S.Ct. at 1892).

The requirement in New York that witnesses reside in the same congressional district as the delegate candidates for whom they are circulating petitions is even more burdensome to core political speech than the one at issue in *Buckley*, since it takes the pool of registered Republican voters in New York State (approximately 3.1 million, all of whom otherwise would be available to circulate petitions in every district absent the residence requirement) and reduces that total by at least 2.9 million voters in the congressional districts with the largest Republican enrollment and by more than 3 million voters in the districts with the smallest enrollment. *See* http://www.elections.state.ny.us/enroll-ment/enroll.htm (New York State Board of Elections website listing the total number of registered Republican voters statewide and in each county as of November 1, 1999).

Moreover, the restriction on the candidate petition signature gatherers here erodes the same First Amendment interests as the initiative petition signature gatherers' restrictions in *Buckley* and *Meyer*. Because signature gatherers commonly urge support of voters — in one case for the initiative and in the other for the candidate — any significant reduction in the number of signature gatherers reduces the amount of voices who will convey the message; it also reduces the chances that those supporting the candidates will gather signatures sufficient to qualify for the ballot and thus eliminates the conse-quent debate on the candidates and issues that elections resolve. *See Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214, 223, 109 S.Ct. 1013, 1020, 103 L.Ed.2d 271 (1989) ("Free discussion about candidates for public office is no less critical before a primary than before a general election. In both instances, the 'election campaign is a means of disseminating ideas as well as attaining political office' " (internal citations omitted)). Indeed, the Supreme Court has recognized that initiatives and elections for public office are the only two means by which "voters can assert their preferences," and laws that operate to restrict ballot access implicate the right to vote. *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979) (internal quotation marks omitted); *see also Buckley*, 525 U.S. 182, 119 S.Ct. at 641–42 ("Initiative-petition circulators also resemble candidate-petition signature gatherers, . . . for both seek ballot access").

Nor is it any answer to say that presidential candidates are free to use notaries regardless of residence. No one makes a living as a notary public. Those who qualify pay a fee of $30 and (unless they are lawyers) take a written examination. New York Executive Law § 131. They usually do so as an accommodation to clients (as in the case of lawyers) or to customers (as in the case of bank officers and others). One has to either recruit volunteers from this group [11] or pay notaries substantially for their services (as Mr. Forbes did, often after financing their efforts to become notaries). Short of that, a potential volunteer must go through the time and expense of becoming a notary. The availability of this " 'more burdensome' " alternative is not sufficient to relieve the burden that the residence requirement imposes on the

---

11. There are approximately 247,830 notaries public in New York State; there are approxi-mately 3.1 million registered Republicans.

First Amendment. *Meyer v. Grant,* 486 U.S. 414, 424, 108 S.Ct. at 1893, 100 L.Ed.2d 425 (1988) (citation omitted) (holding that the alternative of volunteer initiative-petition circulators did not mitigate the burden imposed by the prohibition against paid circulators).

The only present comprehensible purpose of the residence requirement (and the separate listing of the witness's town or city of residence, which was adopted to help enforce the residence requirement), as previously noted, is to disadvantage a candidate for President who does not enjoy the support of the Republican State Committee. This burden is not a coincidence. Instead, it is the product of deliberate design, a consideration that should alone be sufficient to invalidate it, even if it could otherwise be sustained. *Schulz,* 44 F.3d at 58; *see also* Laurence H. Tribe, *American Constitutional Law* § 12–6, at 822 (2d ed.1988) ("where an illicit reason has played a substantial role in the legislature's deliberations, it may reasonably be said that the decisional calculus has been impermissibly skewed").

The role of the Republican State Committee in the enactment of the legislative scheme was conceded in the proceedings challenging it in 1996. *See Rockefeller II,* 917 F.Supp. at 164–65. Nor is it seriously disputed that the legislative scheme adopted for the 2000 primary was likewise passed at the behest of the Republican State Committee. *See* Buley Aff. ¶¶ 16, 18. The legislative scheme, which was chosen by the Republican State Committee and enacted into law as part of the accommodation that the Republican and Democratic Parties in the Legislature make to each other, "consistently and decisively advantages the candidate [the Republican State Committee] supports and discourages and disadvantages the candidates it has rejected." *Rockefeller II,* 917 F.Supp. at 164.[12] While this may further the interest of the Republican State Committee, as distinguished from the 3.1 million New York voters affiliated with the Republican Party, it undermines the very purpose of a primary, which is "to protect the general party membership against this sort of minority control [by the party leadership]," *Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 236, 107 S.Ct. 544, 560, 93 L.Ed.2d 514 (1986) (dissenting opinion of Scalia, J.), and it cannot provide either a rational or compelling basis for the witness residence requirement.

In *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), the Supreme Court took note of the reality that "the drafting of election laws is no doubt largely the handiwork of the major parties that are typically dominant in state legislatures." *Id.,* 460 U.S. at 803 n.30, 103 S.Ct. at 1577 n.30. Consequently, it cautioned "that the particular interests of the major parties can[not] automatically be characterized as legitimate state interests." *Id.* Instead, the manner in which election laws are enacted requires that "we must 'pass[ ] judgment' on the 'legitimacy and strength' of the state's proffered interests." *Schulz v. Williams,* 44 F.3d 48, 58 (2d Cir.1994) (quoting *Anderson,* 460 U.S. at 789, 103 S.Ct. at 1570). My judgment is that the requirements that a witness reside in the congressional district in which he or she is witnessing a signature and that a witness or signer separately list the town or city in which he or she resides in addition to his or her residence address fail under any test.

### *Conclusion*

To the extent that Governor George W. Bush, Steve Forbes, Alan Keyes and Senator John McCain, as of the date of this order, have not qualified one or more delegate candidates or alternate delegate candidates committed to them in any congressional district, they have until 5:00 p.m. on February 10, 2000 to submit names to the New York State Board of

---

**12.** In enacting Chapter 137, the Legislature expressly made § 6–132 applicable to the ballot access scheme for the Primary. See Chapter 137 § 3[6][a].

Elections (names must be qualified under Republican Party rules — *i.e.*, enrolled Republicans who reside in the applicable congressional district — and facsimile transmission of names is acceptable as long as any such transmission is received by 5:00 p.m. on February 10, 2000). Upon receipt of the above-described lists of delegate candidates and alternate delegate candidates, the New York State Board of Elections shall certify the Primary ballot to be used in each of the state's congressional districts. The county boards of elections are directed to print the names of the delegate candidates and alternate delegate candidates on the March 7, 2000 Republican Primary ballot, in accordance with New York State Board of Elections certification procedures.

The breadth of this relief reflects in part the agreement of the parties. This is why Bush delegate candidates are included within the scope of the order, even though Governor Bush did not appear and formally request that portion of the relief that placed his delegate candidates on the ballot in the 16th Congressional District. Indeed, Mr. Keyes arguably was not entitled to the relief as it applies to him because he made no attempt to gather petitions to meet even the unchallenged statewide 5,000–signature requirement for presidential candidates, let alone the 0.5% requirement for delegate candidates, and he sought to intervene only after the petitioning period had ended. This concern, however, goes to the potential unfairness of allowing Mr. Keyes to "piggy back" upon the efforts of those candidates who went to the burden and expense of petitioning. *See Mahon v. Abrams*, 88 Civ. 1745, unpublished op. at 12–13 (S.D.N.Y. Mar. 21, 1988) (Sand, J.), *aff'd without op.*, 847 F.2d 835 (2d Cir.1988) (declining to grant preliminary injunctive relief to supporters of Senator Dole and Pat Robertson by placing their delegate candidates on the ballot,

since such relief could be granted only "if one were to eliminate entirely the requirement of any petitions or signatures for the Dole–Robertson slates" — a result that "would be exceedingly unfair to a candidate who engaged in the petition signature process"). Nevertheless, since no candidate objects, this equitable concern does not justify denying Mr. Keyes the relief he seeks.

SO ORDERED.